PLANTERS' COMPRESS COMPANY v. J. D. HOWARD.

Decided January 6, 1906.

**Landlord and Tenant—Sales by Tenant—Loss of Lien.**

While the law does not require the landlord to notify the commercial world of the existence of his lien, he can not impose on those purchasing in open market the products on which he has a lien, by knowingly and continuously permitting his tenant to sell the same, and accepting a part of the proceeds of such sales, and then claiming that the sales were unauthorized. Facts considered, and held to show a waiver of his lien by a landlord.

Appeal from the County Court of Bosque County. Tried below before Hon. P. S. Hale.

*Crane & Gilbert,* for appellant.—When a landlord repeatedly receives his rent out of the proceeds of cotton grown on rented premises, knowing it to be such, he ratifies the sales thereof made by the tenant, and thereby waives his landlord's lien as against the purchaser from the tenant. McCollum v. Wood, 33 S. W. Rep., 1087; Planters' Compress Company v. Howard, 80 S. W. Rep., 120; Wright v. Dickey, 50 N. W. Rep., 206.

*Cureton & Cureton* and *Robertson & Robertson,* for appellee.—It is no part of the legal duty of a landlord to proclaim the fact of his lien from the house-tops, or to hunt down and notify persons of his lien.

The statute does that for him. One who blindly or recklessly purchases cotton from tenants, making no inquiry or investigation of any character as to the existence of liens, does so at his peril. The law charges him with notice, and no one can be an innocent purchaser as to a landlord's lien, who purchases the cotton within one month after it has been removed from the rented premises. Mathews v. Burke, 32 Texas, 419; American Cotton Co. v. Phillips, 71 S. W. Rep., 320.

CONNER, CHIEF JUSTICE.—On a former appeal a judgment in appellee's favor was reversed because of the submission of an erroneous charge, as will be seen by a reference to the 80 S. W. Rep., 119. The case is again before us and the only assignment of error we deem material is that under which appellant asserts that the testimony does not sustain the verdict and judgment in appellee's favor now under review. Briefly stated the facts show that appellee rented certain lands in Bosque County to P. A. Holt for the year 1902, upon which said Holt and a son raised, among other things, a crop of cotton. Appellee furnished his tenant certain supplies to enable him to make a crop, and by the terms of the rental contract was entitled to one-fourth of the cotton as rent. This suit was instituted upon the 11th of May, 1903, by appellee against appellant to recover the value of certain cotton alleged to have been raised on the rented premises, upon which he alleged he had a lien to secure several hundred dollars for advances made to said tenant, and which said cotton, it was alleged, had been sold to and converted by the appellant company. On the trial appellee recovered judgment for the sum of $331.80 and, as before stated, it becomes our duty to determine the sufficiency of the evidence to sustain the verdict and judgment.

It is undisputed that the premises described in appellee's petition were rented as alleged, and that the tenant Holt, together with his son, raised about twenty-two bales of cotton, and that appellee furnished advances substantially as alleged. It must also be held from the evidence, in deference to the verdict of the jury, that appellee gave the tenant no authority to sell the cotton, but on the contrary, that some time about the 15th of October, 1902, he forbade the sale of any more cotton until the advances made by him had been paid, it appearing from the evidence that some six or seven bales of cotton had been sold by Holt prior to this time without having discharged the lien thereon for advances. It is also undisputed that appellee gave no notice to appellant of the existence of his lien or of his notice to Holt not to sell. The crucial point however in the case, is whether the evidence conclusively shows that appellee waived his lien as against appellant notwithstanding the circumstances hereinbefore stated. Upon this point the evidence is substantially as follows: Appellee lived some nine or ten miles from Valley Mills where appellant was engaged in business. Holt made sales of cotton to the appellant company after October 19 as follows:

Oct. 24, 2 bales, 1,600 lbs. each, for which it paid to Holt $81.00
29, 1 " " " " " " 47.00
Nov. 1, 1 " " " " " " 43.44
12, 1 " " " " " " 41.00
19, 1 " " " " " " 42.36
29, 1 " " " " " " 40.00
Dec. 10, 1 " " " " " " 41.80
18, 1 " " " " " " 33.36
26, 1 " " " " " " 20.48
30, 1 " " " " " " 24.80

Total, 11      $415.24

Previous thereto, during October, Holt had sold to the appellant company some five bales and to others six or seven bales. Upon all cotton sold, Holt regularly reported sales and paid to appellee the rent money. We quote the following from appellee's testimony: "The defendant, Planters' Compress Company, has its plant at Valley Mills, where it had been buying cotton for two or three years. The sales made by Holt to defendant were shown by tickets issued to him on their printed stationery, and these tickets were brought or sent by Holt to me, and the calculations of my part (rent) were made on the back of the tickets, and the rent was paid to me according to the weights and prices shown by the tickets. I have none of these tickets; Holt kept them, but they were exhibited to me. According to the tickets, Holt sold the cotton at from forty to forty-five dollars a bale in the seed, and I was entitled to one-fourth of the proceeds as rent. The supplies which I furnished the Holts have never been paid for except as shown by the credits on the accounts attached to my petition, amounting to fifty-two or fifty-three dollars. I called on P. A. Holt several times for a settlement of this account. Up to about the 10th or 15th of October, Holt had sold six or seven bales. He had paid or sent me the rents out of the bales. I called on him after he had sold four or five bales to defendant and he had not paid me any money on these accounts, but he put me off at different times when I would present the matter to him. He would keep putting me off with first one excuse and then another, and I began to get uneasy. Several times during the year I called Holt's attention to the fact that I had a landlord's lien on three-fourths of the cotton to secure this supply account. I never at any time consented for said Holt to sell the cotton to the defendant, Planters Compress Company. He sold it without my consent. About the 10th or 15th of October I forbade him selling any more cotton. . . . After the cotton was removed from the rented premises, it was sold within a day or two after such removal, and as fast as a bale or two was gathered. . . . Sometimes it would be a day or two after he sold the cotton and sometimes two or three days before he would bring me the tickets and pay my rent out of the cotton sold." On cross examination he testified, among other things, as follows: "I think Holt sold two bales to the Schow Brothers before he sold any to the defendant. . . . Holt gathered the cotton and carried it off and sold it without my knowing anything about it.

"I was busy there in the store. I got the rent from the cotton Holt sold to Schow Brothers. Holt brought and sent the rent to me and paid it to me in my place of business. He generally brought or sent the rent to me pretty soon after he sold the cotton. I knew soon after he had sold the cotton to Schow Brothers of its sale to them and received the rent for it from Holt. I have not sued Schow Brothers for that cotton. I wanted to be sure of my money and they did not buy enough to pay this account and I wanted to sue the party that bought the bulk of it. The next cotton was sold to the defendant. I think some of the cotton was sold to the defendant in September. All the cotton that defendant bought was in the seed. Think Holt made about twenty different sales of cotton to the defendant. I received the rent. Holt paid me rent on cotton sold to the defendant about twenty times. I knew after Holt had sold the cotton to defendant, and from what he said that he had taken it to Valley Mills to sell. When Holt paid me the rent I knew he had sold the cotton. I knew when each successive sale was made to the defendant by Holt bringing me the tickets for the sales made to the defendant, and knew from that that defendant had bought cotton from Holt. The sales were shown to have been made to defendant by their printed stationery and tickets showing amount of sales, which Holt exhibited to me, showed the weights of the cotton and the prices paid for it, and that the sale was made to the defendant. I never made any express objections to Holt's making sales of the cotton at any time prior to the 10th or 15th of October, and then only made my objection to Holt and no one else was present. Up to the 10th or 15th of October I made no express objection to any sales made by Holt, and did not then or thereafter notify the defendant that I objected to any sales made to it by Holt, but I did not consent to any sale. Valley Mills is about nine or ten miles from my place of business at Moshein, and is the railroad station to which I sent my wagon for freight during the fall and winter of 1902. I sent my wagon during the time the cotton was being marketed to Valley Mills for freight and there was a daily mail between Valley Mills and Moshein, where I live.

"I did not notify the defendant that I had any interest in the cotton being sold to them by Holt during the fall and winter of 1902 either by letter or otherwise, and they never notified me they were buying cotton. I got the rents from all the cotton sold by Holt to the defendants within a few days after each sale was made. . . . I did not go to see the defendant until after the season was over and their gin had been shut down and all the purchases of the cotton which they made had been concluded. Holt made his objection to paying the account about the 10th or 15th of October. The dispute arose over hauling him water and digging a well. I did not tell Holt anything about selling cotton till about the 10th or 15th of October when I forbade him selling any more cotton. I did not protest against any sales he made up to October 10 or 15. I expected him to pay the rent and the advances. I do not know that I would have questioned his authority to sell the cotton if he had paid me the advances like he paid the rent. Do not think I would have done so because if I had gotten the money for the advances that was all I was entitled to. I do not think I went to Valley Mills during the time Holt was selling this cotton. I never met any

of the parties connected with the defendant company except a Mr. Ellison, and met him after all this cotton was bought. The sales of cotton to the defendant extended over a period of more than two months. They extended from some time in September until some time in December. . . . Every time he came to me with the money for rent I took it because I thought I had a right to. . . . Holt and I had no understanding at all about selling the cotton. He just gathered it and sold it."

The foregoing quotations are taken from the agreed statement of facts found in the transcript, and we feel constrained to hold that it conclusively appears from the evidence as a whole that appellee's lien was waived and that therefore the appellant company took the cotton free therefrom.

While the law does not require the landlord to go forth and notify the commercial world of the existence of his lien, he can not impose upon those purchasing commodities in the open market by knowingly and continuously permitting unauthorized sales in the proceeds of which he participates. With the undisputed knowledge appellee had of the many sales made to appellant in this case, we think the receipt of a part of each successive sale necessarily constituted a ratification of all such sales and amounted in legal effect to original authority in the tenant to sell. To hold otherwise would be to establish a rule injuriously affecting trade and to permit the commission of wrongs upon those engaged therein. (See Gilliam v. Smither, 33 S. W. Rep., 985; McCollum v. Wood, 33 S. W. Rep., 1087.)

Inasmuch as the case appears to have been fully developed and fairly submitted to the jury, we conclude that it is in the interest of all parties that further litigation be terminated. It is accordingly ordered that the judgment be reversed and here rendered for appellant.

*Reversed and rendered.*